UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TEAMSTERS LOCAL UNION NO. 75, | |
| Plaintiff, | |
| v. | Case No. 18-cv-05843 |
| CENTRAL CONTRACTORS SERVICE, | Judge Martha M. Pacold |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER**

      Plaintiff Teamsters Local Union No. 705 ("the Union") and Defendant, Central Contractors Service, Inc. ("Central Contractors"), a rental and leasing company specializing in heavy construction equipment in Cook County, Illinois, are parties to a collective bargaining agreement (CBA). Central Contractors engages in specialized transportation of equipment to job sites using specialized trucks and employs drivers of the specialized trucks. The Union alleges that from 2011 to 2016 Central Contractors violated the CBA by subcontracting work to a firm that was not a party to the CBA and failing to notify the Union (by holding a "pre-job conference" with the Union's representative) before doing so. This case is one of two cases stemming from that dispute.

      First, in September 2016, the Union filed a grievance against Central Contractors. Under the collective bargaining agreement's grievance procedures, the grievance was submitted to a Joint Grievance Committee (JGC). The JGC issued a decision in favor of the Union in May 2017. The Union filed this case in federal court in August 2018 to enforce the JGC's decision. In October 2018, Central Contractors filed a counterclaim to vacate the JGC's decision.

      Second, in March 2017, while the grievance was pending, the Local 705 International Brotherhood of Teamsters Pension Fund ("the Pension Fund"), the Local 705 International Brotherhood of Teamsters Health and Welfare Fund ("the Welfare Fund") (collectively, "the Funds"), and their trustees brought suit in federal court in this district against Central Contractors. The Funds and their trustees sought unpaid contributions that the Funds claimed Central Contractors would have owed had it assigned work to members of the bargaining unit rather than subcontracting work to a firm that was not a party to the CBA. In March 2019, the district court granted summary judgment to Central Contractors and denied

summary judgment for the Funds and trustees. *Local 705 Int'l Bhd. of Teamsters Pension Fund v. Cent. Contractors Serv., Inc.*, No. 19-cv-01689, 2019 WL 1200672, at *6 (N.D. Ill. Mar. 14, 2019), *appeal dismissed sub nom. Int'l Bhd. of Teamsters Pension Fund, Local 705 v. Cent. Contractor's Serv., Inc.*, No. 19-1689, 2019 WL 5152780 (7th Cir. May 10, 2019).

Turning back to this case: After the district court issued its decision in *Local 705* in favor of Central Contractors, Central Contractors filed in this case in March 2019 an amended answer, affirmative defenses, and counterclaim. As before (in the original October 2018 counterclaim), the amended counterclaim seeks to vacate the JGC's decision. The amended affirmative defenses add res judicata and collateral estoppel based on the *Local 705* district court decision.

The Union now moves to dismiss Central Contractors' amended counterclaim and to strike Central Contractors' amended affirmative defenses. [41]. For the following reasons, the motion is granted.

## BACKGROUND

### I.   The Parties, the CBA, and the JGC

Central Contractors is a company based in Cook County, Illinois that "operates a rental and leasing company specializing in heavy construction equipment." [40] at 2 ¶ 3.[1] Central Contractors engages in specialized transportation of equipment to job sites using specialized trucks and employs drivers of the specialized trucks. [40-3] at 18:13-22.

The Union represents a bargaining unit of certain Central Contractors' employees as defined in the CBA. [40] at 3 ¶ 7.

The Union and Central Contractors entered into a series of collective bargaining agreements, including an agreement that went into effect on April 1, 2015. [40] at 4 ¶ 8. The parties agree that the CBA remains in effect under its automatic renewal clause. [40] at 4 ¶ 8.

The CBA contains grievance procedures. Article 6 § 5 specifies that a Joint Grievance Committee "composed of three (3) Employer representatives designated by the Motor Carrier Labor Advisory Council and Chicago Regional Trucking Assoc., Inc., and three (3) Union representatives designated by the Union" may resolve disputes between the Union and Central Contractors. [1-4] at 6–7. "If the Joint Grievance Committee resolves the dispute by a majority vote of those present

---

[1] Bracketed numbers refer to entries on the district court docket and are followed by the page and / or paragraph number. Page numbers refer to the ECF page number.

2

and voting, then such decision shall be final and binding upon the Union, Employer, and Employee." [1-4] at 7.

## II. The Grievance and This Case

On September 22, 2016, the Union filed Union Grievance No. 266386 (the "Grievance"). [40] at 14 ¶ 11. In that grievance, the Union alleged that "Central Contractors violated the CBA when it subcontracted bargaining unit work without first holding a pre-job conference with Local 705." [40] at 14–15 ¶ 11. The Union's claims related to subcontracting and failure to notify the union beforehand between October 1, 2011 and April 30, 2016. [40-3] at 11:2-6. The Union requested the following remedies: "[t]hat the contract be enforced, all affected parties made whole, and cease and desist all subcontracting and failing to hold pre-job conferences, hire additional employees so no subcontractors are used, make full back payments to health/welfare and pension contributions, and undertake any and all relief to cure the contract violations." [40] at 15 ¶ 11.

On May 19, 2017, a Joint Grievance Committee (the JGC) held a hearing on the Grievance. [40] at 5–6 ¶ 10. Both parties presented, and the JGC issued a decision on the same day. [40-2]; [40] at 6 ¶¶ 10–11. The "Resolution of Grievance" section at the end of the grievance form reflects that the Grievance was "sustained" based on a "violation of Articles 1, 4, 5, 13" of the CBA. [40-2]; [40] at 6 ¶ 11. (Those articles set forth, among other things, duties related to pre-job conferences and subcontracting. [40] at 15–16 ¶¶ 12–13.) The same "Resolution of Grievance" section of the grievance form also instructed the parties to "[r]eview monetary compensation relative to grievances – Committee holds jurisdiction." [40-2]; [40] at 6 ¶ 11. The hearing transcript reflects the same decision. [40-3] at 44:4-11 ("Grievance No. 266386, after Executive Session, based on the facts presented, the grievance is sustained on violation of Articles 1, 4, 5, and 13, and we suggest that the parties meet and review the monetary compensation relative to the grievance and the Committee will hold jurisdiction over that monetary (inaudible).").

In June 2017, the parties met to discuss compensation, and Central Contractors indicated that it was unwilling to pay. [40] at 7 ¶ 12. In July, the Union informed Central Contractors that it owed $103,524.17 to the Local 705 International Brotherhood of Teamsters Health & Welfare Fund, and $129,524.17 to the Local 705 International Brotherhood of Teamsters Pension Fund (collectively, the "Funds"). Central Contractors continued to refuse to pay. [40] at 7 ¶ 13.

Central Contractors alleges that on August 7, 2018, the Union filed a new grievance over Central Contractors' failure to "pay the award stated in the Joint Grievance Committee's grievance decision for Grievance #266386." [40] at 18 ¶ 22.

On August 27, 2018, the Union brought this suit under Section 301 of the Labor Management Relations Act (LMRA), 29 U.S.C. § 185, to enforce the JGC's

May 19, 2017 decision. On October 18, 2018, Central Contractors filed an answer, affirmative defenses, and counterclaim; the counterclaim sought to vacate the JGC's decision under Section 301 of the LMRA. [11].

As noted below, in March 2019, after the district court decision in *Local 705*, Central Contractors filed an amended answer, amended affirmative defenses, and amended counterclaim seeking to vacate the JGC's decision and asserting that the *Local 705* decision precludes this litigation. [40].

### III.  The *Local 705* Case

Meanwhile, while the Grievance was pending, the Funds and their trustees filed a suit in March 2017 against Central Contractors in federal court in this district, Case No. 17-cv-01641. [40] at 16 ¶ 14. The Funds and trustees sought to recover damages from Central Contractors for the same alleged violations of the CBA at issue in the Grievance. [40] at 16 ¶ 15.

On March 14, 2019, the district court granted summary judgment for Central Contractors and denied summary judgment for the Funds and trustees. *Local 705*, 2019 WL 1200672, at *6. The court held that the CBA permitted subcontracting under certain circumstances, that the Funds "ha[d] not developed evidence sufficient to permit a reasonable jury to conclude that CCS [Central Contractors] breached the CBAs by subcontracting with a firm whose employees earn less in pay and benefits than CCS's own employees," and that "[e]ven if the Court were to agree with plaintiffs that CCS breached the CBAs by subcontracting with Bil-Mac [a firm that was not a party to the CBA], plaintiffs have not proven their damages by any valid measure." *Local 705*, 2019 WL 1200672, at *5.

Shortly after the *Local 705* district court decision, in March 2019, Central Contractors filed in this case an amended answer, amended affirmative defenses, and amended counterclaim. [40]. In that pleading, Central Contractors seeks to vacate the JGC's decision and asserts that the *Local 705* decision precludes through res judicata and collateral estoppel this litigation over the JGC decision.

### IV.  The Pending Motion

The Union moves to dismiss Central Contractors' amended counterclaim and to strike Central Contractors' amended affirmative defenses. [41]. As to the counterclaim, the Union contends that it is untimely and fails to state a claim. As to the affirmative defenses, the Union raises a variety of arguments but focuses principally on Central Contractors' preclusion defenses.

The court has subject matter jurisdiction over this case under 28 U.S.C. § 1331 and 29 U.S.C. § 185 (Section 301 of the LMRA).

## DISCUSSION

### I. Motion to Dismiss Amended Counterclaim

Central Contractors' amended counterclaim seeks to "vacate a decision issued by the Joint Grievance Committee on May 19, 2017" pursuant to Section 301 of the LMRA, 29 U.S.C. § 185. [40] at 13 ¶ 1. The Union moves to dismiss, arguing that the counterclaim (1) is untimely and (2) fails to state a claim for relief. The court addresses these arguments in turn.

#### A. Statute of Limitations

The first issue is timeliness. The Union argues that Central Contractors' counterclaim is time-barred on its face. Central Contractors first filed a counterclaim challenging the JGC's May 19, 2017 decision on October 18, 2018—over a year after the decision. [11]. The Union argues that since Central Contractors did not challenge the decision within ninety days, the counterclaim falls outside the applicable statute of limitations.

The statute of limitations for actions to vacate arbitration awards under Section 301 of the LMRA is ninety days, by reference to the appropriate Illinois statute of limitations. *Plumbers' Pension Fund, Local 130, U.A. v. Domas Mech. Contractors, Inc.*, 778 F.2d 1266, 1268 (7th Cir. 1985). "The LMRA provides no statute of limitations for actions challenging arbitration awards. Accordingly, the United States Supreme Court has held that, as a matter of federal law, timeliness under section 301 is to be determined 'by reference to the appropriate state statute of limitations.'" *Id.* (quoting *UAW v. Hoosier Cardinal Corp.*, 383 U.S. 696, 704–05 (1966)). In Illinois, the appropriate statute of limitations comes from the Illinois version of the Uniform Arbitration Act. *Plumbers' Pension Fund*, 778 F.2d at 1268. That statute requires that "[a]n application under this Section," that is, an application to vacate an award, "shall be made within 90 days after delivery of a copy of the award to the applicant," except in circumstances not relevant here. 710 ILCS 5/12(b). This limitation period applies equally to actions to vacate decisions of a joint grievance committee. *See Teamsters Local No. 579 v. B & M Transit, Inc.*, 882 F.2d 274, 275-76 (7th Cir. 1989); *Painters' Dist. Council No. 30 v. Rock-It Interiors, Inc.*, 190 F. Supp. 3d 803, 810 n.4 (N.D. Ill. 2016).

Central Contractors, however, argues that the ninety-day statute of limitations in the Illinois Act does not apply to awards arising from collective bargaining agreements. Central Contractors cites 710 ILCS 5/12(e), which provides: "Nothing in this Section or any other Section of this Act shall apply to the vacating, modifying, or correcting of any award entered as a result of an arbitration agreement which is a part of or pursuant to a collective bargaining agreement; and the grounds for vacating, modifying, or correcting such an award shall be those which existed prior to the enactment of this Act." This argument is squarely

foreclosed by Seventh Circuit precedent. *Plumbers' Pension Fund* held regarding the same provision (since renumbered): "This language does not preclude the Act's application here. Our mission after *Hoosier Cardinal* is to select the most analogous state statute of limitations, and the Illinois legislature's apparent intent to preserve pre-Act federal timeliness provisions and grounds for vacating does not affect our conclusion that the Illinois 90-day limitation period is closely analogous to the situation here." *Plumbers' Pension Fund*, 778 F.2d at 1269 n.1. For LMRA purposes, once the analogous period is selected, "reference to the statute from which it was borrowed is at an end." *Int'l Union of Operating Engineers, Local 150, AFL-CIO v. Centor Contractors, Inc.*, 831 F.2d 1309, 1312 (7th Cir. 1987).

Central Contractors also argues that the limitation period did not begin to run on May 19, 2017, the date of the JGC's decision. On that day, the JGC sustained the Grievance and decided that Central Contractors had violated Articles 1, 4, 5, and 13 of the CBA through Central Contractors' staffing practices, but it did not specify the amount of money Central Contractors owed. Because of this unresolved issue of damages, Central Contractors argues that the decision was not final.

Courts ordinarily should not entertain actions to enforce or vacate arbitration awards before they are final and binding under the relevant CBA. *Gen. Drivers, Warehousemen & Helpers, Local Union No. 89 v. Riss & Co.*, 372 U.S. 517, 520 (1963). "Final and binding" are terms of art frequently used in collective bargaining agreements to "designate the last step in the arbitration process and declare that the product of that step will be legally binding on the parties." *Union Switch & Signal Div. Am. Standard Inc. v. United Elec., Radio & Mach. Workers of Am., Local 610*, 900 F.2d 608, 613 n.5 (3d Cir. 1990) (citations omitted). Indeed, here the CBA provided the JGC with authority to make "final and binding" decisions. [1-4] at 7 ("If the Joint Grievance Committee resolves the dispute by a majority vote of those present and voting, then such decision shall be final and binding upon the Union, Employer, and Employee.").

The words "final and binding" are not a requirement of the jurisdictional grant in Section 301 of the LMRA. 29 U.S.C. § 185. But as a prudential matter, federal courts generally only entertain actions under Section 301 of the LMRA when the arbitrator's award is "final and binding." *See Peabody Holding Co., LLC v. United Mine Workers of Am., Int'l Union, Unincorporated Ass'n*, 815 F.3d 154, 159 (4th Cir. 2016) ("[T]he complete arbitration rule necessarily constitutes only a prudential limitation on a court's authority to review a labor arbitrator's decision."); *Union Switch*, 900 F.2d at 613.

Under the "complete arbitration rule," an award is final when the arbitrator "believes the assignment is completed." *McKinney Restoration, Co. v. Illinois Dist. Council No. 1 of Int'l Union of Bricklayers & Allied Craftworkers*, 392 F.3d 867, 872 (7th Cir. 2004).

The Seventh Circuit has held that in certain circumstances, an arbitral award may be final and binding "even if all it did was determine liability, leaving thorny remedial issues for future determination." *Smart v. Int'l Bhd. of Elec. Workers, Local 702*, 315 F.3d 721, 726 (7th Cir. 2002). *Smart* relied on the fact that the only question put to the arbitrator was the question of liability. The arbitrator determined liability and directed the parties to calculate the amount owed. Since the arbitrator's only task had been completed, the decision was final. *Id.* at 726.

On the other hand, where an arbitrator determines liability but instructs the parties to confer about the monetary remedy while retaining jurisdiction over that issue, some courts have found that the liability determination is not "final and binding." *See Ameritech Servs., Inc. v. Local Union No. 336, Int'l Bhd. of Elec. Workers*, 1997 WL 222439, at *7 (N.D. Ill. Apr. 30, 1997); *Peabody*, 815 F.3d at 160.

As these cases make clear, the key question is whether the JGC believed it resolved the dispute it was tasked with resolving. *See McKinney*, 392 F.3d at 872. The record is inconclusive on that point. The Union's Grievance requested specific remedies, including "full back payments to health/welfare and pension contributions." [40-2]. The JGC did not order or deny that relief on May 19, 2017. Instead, it instructed the parties to "[r]eview monetary compensation relative to grievances" and retained jurisdiction. [40-2]; *see also* [40-3] (Hrg. Tr.) at 44:4-11. On June 14, 2017, the parties met to discuss the matter, and Central Contractors informed the Union that it would not pay any financial compensation or otherwise comply with the JGC's decision. [40] at 7 ¶ 12. On July 20, 2017, the Union informed Central Contractors in writing of the amount of financial compensation allegedly owed under the JGC's decision. [40] at 7 ¶ 13. According to Central Contractors, the Union filed a second grievance on August 7, 2018, based on Central Contractors' failure to pay. [40] at 18 ¶ 22.

Considering this series of events, it is not clear that the JGC intended its May 19, 2017 decision to be a complete disposition of its entire assignment. It also is not clear whether the JGC believed it had completed its assignment at some later point. Given the factual uncertainty about when if at all the JGC issued a "final and binding" award, Central Contractors' counterclaim is not time-barred on its face.

### B. Failure to State a Claim

Although Central Contractors' counterclaim is not time-barred, the Union also argues that it should be dismissed pursuant to Rule 12(b)(6) for failure to state a claim. For the following reasons, the court agrees.

To survive a 12(b)(6) motion to dismiss, a counterclaim must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see Cozzi Iron & Metal, Inc. v. U.S. Office Equip., Inc.*, 250 F.3d 570, 574

(7th Cir. 2001) (Rule 12(b)(6) standard applies to motions to dismiss counterclaims). A claim has facial plausibility when the claimant "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). When considering a motion to dismiss, the court accepts all well-pleaded factual allegations as true and views them in the light most favorable to the non-moving party. *Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 632 (7th Cir. 2013). On the other hand, "[t]he complaint must do more than recite the elements of a cause of action in a conclusory fashion." *Roberts v. City of Chicago*, 817 F.3d 561, 565 (7th Cir. 2016) (citing *Iqbal*, 556 U.S. at 678).

In its counterclaim, Central Contractors asserts numerous grounds for vacating the JGC's decision. First, it contests the decision on the merits, alleging that the CBA unambiguously allows Central Contractors to subcontract and that Central Contractors met its obligations under other relevant provisions of the CBA. [40] at 19–20. In essence, Central Contractors alleges that the JGC misinterpreted the terms of the CBA. However, the CBA states that if a Joint Grievance Committee resolves a dispute regarding the "application, meaning or interpretation" of the CBA "by a majority vote of those present and voting, then such decision shall be final and binding upon the Union, Employer, and Employee." [1-4] at 6–7. Since the parties agreed to this binding method of dispute resolution, it is "not open to the courts to reweigh the merits of the grievance." *Merryman Excavation, Inc. v. Int'l Union of Operating Engineers, Local 150*, 639 F.3d 286, 289 (7th Cir. 2011) (quoting *General Drivers, Warehousemen and Helpers, Local 89 v. Riss & Co.*, 372 U.S. 517, 519 (1963)). The court is "responsible only for the question of arbitrability," and will not review "the potential merits of the underlying claims." *Lippert Tile Co. v. Int'l Union of Bricklayers & Allied Craftsmen, Dist. Council of Wisconsin & Its Local 5*, 724 F.3d 939, 944 (7th Cir. 2013) (citations and quotations omitted).

In reviewing grievance committee awards, courts must ensure that the award "draws its essence from the collective bargaining agreement." *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 36 (1987) (citations omitted). But courts may only reject awards on this basis when the arbitrator clearly acts outside the scope of contractual authority and decides on a basis other than permissible contractual interpretation. *See United States Soccer Fed'n, Inc. v. United States Nat'l Soccer Team Players Ass'n*, 838 F.3d 826, 835–36 (7th Cir. 2016) (courts may reject an award where the arbitrator ignored, rather than misunderstood, the express terms of the CBA). "[T]he question presented to 'a federal court asked to set aside an arbitration award . . . is not whether the arbitrator or arbitrators erred in interpreting the contract; it is not whether they clearly erred in interpreting the contract; it is not whether they grossly erred in interpreting the contract; it is whether they interpreted the contract.'" *Id.* at 832 (quoting *Hill v. Norfolk & W. Ry. Co.*, 814 F.2d 1192, 1194–95 (7th Cir. 1987)).

8

Central Contractors does not plausibly allege that the JGC did not interpret the CBA in reaching its award. Central Contractors alleges that the JGC's decision exceeded the bounds of the JGC's legal and contractual authority under the CBA since the CBA is clear and Central Contractors complied with its contractual obligations regarding subcontracting and pre-job conferences. [40] ¶¶ 26–29. Moreover, the CBA states: "Nothing herein contained shall authorize the Joint Grievance Committee . . . to alter the terms and conditions of this Agreement or make a new Agreement." [1-4] at 40. However, Central Contractors does not allege any facts to support its claim that the JGC failed to interpret the contract entirely, or any facts at all about the basis for the JGC's decision. On its face, Central Contractors' counterclaim simply disputes the merits of the JGC's contractual interpretation. This approach cannot support a claim for relief.

Central Contractors also appears to rely on its allegation that the Union filed a second grievance to support its theory that the JGC's decision is "not enforceable." [40] at 18. While this argument is relevant to whether the Union can successfully confirm the award, it does not support Central Contractors' counterclaim. The counterclaim seeks to vacate the JGC's May 19, 2017 decision. If that decision was not final or binding, both the Union's claim to enforce the award and Central Contractors' counterclaim to vacate the award would fail; the court could not confirm *or* vacate the award. A lack of finality therefore would not support the affirmative relief requested in the counterclaim.

Separately, Central Contractors also alleges that the JGC's decision was procedurally flawed. According to the counterclaim, the members of the JGC acted with dishonesty and bad faith and had conflicts of interest that tainted their decision. [40] at 20 ¶¶ 30–31. In support of this argument, Central Contractors alleges that several JGC panel members were also plaintiffs in the Funds' suit, *Local 705* (because they were trustees of the Funds), yet refused to recuse themselves from the JGC. [40] at 17 ¶¶ 18–19.

However, the Seventh Circuit has "ma[d]e clear that a joint committee is not a genuine arbitration subject to the Federal Arbitration Act (FAA) and the full requirements of impartiality that apply to genuine arbitration." *Merryman*, 639 F.3d at 290. The parties bargained for a set of procedures and the court's review is limited to the narrow question of whether the parties received those procedures. *Id.* at 290–92; *Lippert Tile*, 724 F.3d at 948 (where a CBA did not explicitly prohibit the filer of a grievance from sitting on the joint committee adjudicating the grievance, the court could not entertain a claim of bias or fundamental unfairness).

Here, the parties bargained for binding resolution from a panel of six individuals: three representing the Union and three representing Central Contractors. [1-4] at 6–7 (Step 3 of the Grievance Procedure (Joint Grievance Committee) involves submitting a disputed matter to "a permanent Joint Grievance Committee composed of three (3) Employer representatives designated by the Motor

9

Carrier Labor Advisory Council and Chicago Regional Trucking Assoc., Inc., and three (3) Union representatives designated by the Union"). The JGC was composed accordingly. [40-3] at 3. Since Central Contractors has not alleged that the alleged conflict of interest caused a violation of the procedures agreed to in the CBA, the conflict of interest allegations do not state a claim for relief. *Merryman*, 639 F.3d at 290–92; *Lippert Tile*, 724 F.3d at 948.

Central Contractors cites additional alleged procedural flaws. The JGC barred Central Contractors' officer Anna Desenick from the Grievance hearing because she had a law license. [40] at 20 ¶ 32. The JGC made this decision pursuant to its procedural rules. *See* [40-1] at 2 ¶ v ("Attorneys representing any of the parties shall not be allowed to present the case."); [40-3] at 8–11. The CBA provides that "[t]he Joint Grievance Committee may adopt such rules of procedure as it determines necessary in its sole discretion," [1-4] at 7; but as in *Merryman*, "those separate procedural rules do not form a part of the agreement," *Merryman*, 639 F.3d at 291, and thus cannot supply a basis for vacating the award. Moreover, the Seventh Circuit has observed that parties may properly bargain for an informal process in which "lawyers for the parties are not even allowed to speak." *Id.* at 291 n.1. Since Central Contractors has not alleged that Desenick had a right to participate under the CBA itself, this allegation cannot support Central Contractors' claim.

Finally, Central Contractors alleges that the JGC's actions denied Central Contractors due process, violated public policy, and denied Central Contractors an opportunity to have a full and fair hearing. [40] at 20 ¶¶ 33–35. Again, joint grievance committees are not required to resolve disputes in any particular manner unless the CBA so requires. *Lippert Tile*, 724 F.3d at 948 ("Section 301 review simply does not include a free-floating procedural fairness standard absent a showing that some provision of the CBA was violated."). Further, Central Contractors' counterclaim simply alleges a violation of "public policy," without further elaboration. [40] at 20 ¶ 34. This claim is insufficiently pled. The Supreme Court has explained that "the legal exception that makes unenforceable a collective-bargaining agreement that is contrary to public policy" requires "an explicit, well-defined, and dominant public policy, as ascertained by reference to positive law and not from general considerations of supposed public interests." *E. Associated Coal Corp. v. United Mine Workers of Am., Dist. 17*, 531 U.S. 57, 62–63 (2000) (citation and internal quotation marks omitted). Central Contractors has not identified any such policy.[2]

---

[2] To the extent that Central Contractors' public policy argument is coextensive with its conflict of interest argument, Central Contractors' argument fails as a matter of law. There is no explicit, well-defined, and dominant public policy against conflicts of interest for joint grievance committees. Courts instead "rely on the balanced voting membership of the joint committee to provide fairness to the interested parties." *Merryman*, 639 F.3d at 292.

10

In sum, Central Contractors has not plausibly alleged that the JGC's decision was invalid under the CBA. The Union's motion to dismiss the amended counterclaim for failure to state a claim under Rule 12(b)(6) is granted.

## II. Motion to Strike Affirmative Defenses

The Union also moves to strike each of Central Contractors' thirteen affirmative defenses under Rule 12(f).

"The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Affirmative defenses are pleadings, and they will be stricken "only when they are insufficient on [their] face." *Heller Fin., Inc. v. Midwhey Powder Co., Inc.*, 883 F.2d 1286, 1294 (7th Cir. 1989). While the Seventh Circuit has not decided whether the heightened standard of *Iqbal*, 556 U.S. at 678, and *Twombly*, 550 U.S. at 570, applies to affirmative defenses, the "majority view" is that the heightened standard enunciated in those cases applies to affirmative defenses. *Shield Tech. Corp. v. Paradigm Positioning, LLC*, No. 11-cv-06183, 2012 WL 4120440, at *8 (N.D. Ill. 2012); *see also Sarkis' Cafe, Inc. v. Sarks in the Park, LLC*, 55 F. Supp. 3d 1034, 1040 (N.D. Ill. 2014). An affirmative defense should be pled with "sufficient factual matter" to be "plausible on its face." *Iqbal*, 556 U.S. at 678. "As a practical matter, however, affirmative defenses rarely will be as detailed as a complaint (or a counterclaim); nor do they need to be in most cases to provide sufficient notice of the defense asserted. But a problem arises when a party asserts boilerplate defenses as mere placeholders without any apparent factual basis." *Behn v. Kiewit Infrastructure Co.*, No. 17-cv-05241, 2018 WL 5776293, at *1 (N.D. Ill. Nov. 2, 2018) (citing *Dorsey v. Ghosh*, 2015 WL 3524911, at *4 (N.D. Ill. 2015)).

### A. Affirmative Defense Nos. 9-11

In its ninth, tenth, and eleventh affirmative defenses, Central Contractors asserts that the March 14, 2019 district court decision in *Local 705*, the parallel case brought by the Funds, bars the Union from seeking enforcement of the JGC's decision, citing collateral estoppel and res judicata. [40] at 11–12 ¶¶ 9–11. The Union argues that Central Contractors has both waived its right to raise these defenses and failed to adequately plead them.

#### 1. Waiver

The Union first argues that Central Contractors has waived the right to raise these defenses by failing to assert them until after the decision in *Local 705*. However, nothing in the record indicates that Central Contractors acquiesced in the separate prosecution of this case and the Funds' case or waived any potential preclusion defense. To the contrary, Central Contractors moved twice to reassign the case so that it could be disposed of alongside the Funds' case in a single

11

proceeding. [17], [23]. After those motions were denied, it moved to stay discovery in this case pending the resolution of the Funds' case. [31]. The Union does not cite any authority that supports its argument that Central Contractors' failure to explicitly raise these defenses earlier in the litigation should constitute waiver given this procedural history.

Additionally, "delay in asserting an affirmative defense waives the defense only if the plaintiff was harmed as a result." *Curtis v. Timberlake*, 436 F.3d 709, 711 (7th Cir. 2005). When the delay does not prevent the parties from presenting and arguing the issue, "technical failure to plead the defense is not fatal." *DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 334 (7th Cir. 1987). This case was stayed until the decision in *Local 705*. Central Contractors subsequently notified this court of the ruling and amended its defenses accordingly. [38], [40]. Thus, the Union did not actively litigate the case with uncertainty about whether Central Contractors would raise res judicata or collateral estoppel. After the stay was lifted, the Union was able to argue its position in the present motion before the case progressed further. *See Manicki v. Zeilmann*, 443 F.3d 922, 927 (7th Cir. 2006) (noting that courts find waiver of res judicata where "the defendant wasted the time of the plaintiff and the court").

Considering the full procedural history of these cases, the court declines to find waiver of these defenses.

### 2. Res Judicata

Next, the Union argues that Central Contractors has not adequately alleged the elements of its res judicata defense.

The preclusive effect of a federal court judgment is determined by federal common law. *Taylor v. Sturgell*, 553 U.S. 880, 891 (2008). In federal court, res judicata (claim preclusion) has three elements: "(1) an identity of the parties or their privies in the first and second lawsuits; (2) an identity of the cause of action; and (3) a final judgment on the merits in the first suit." *Adams v. City of Indianapolis*, 742 F.3d 720, 736 (7th Cir. 2014).

Addressing the third element first, the Union argues that Central Contractors has failed to allege that the ruling in the Funds' suit is final. But the ruling is a final decision on the merits. *See Local 705*, 2019 WL 1200672, at *6 (granting summary judgment and terminating civil case), *appeal dismissed sub nom. Int'l Bhd. of Teamsters Pension Fund, Local 705 v. Cent. Contractor's Serv., Inc.*, No. 19-1689, 2019 WL 5152780 (7th Cir. May 10, 2019).

Second, the Union argues that the causes of action in the two cases are not identical. According to the Seventh Circuit, "two claims are one for purposes of res judicata if they are based on the same, or nearly the same, factual allegations."

*Herrmann v. Cencom Cable Assocs., Inc.*, 999 F.2d 223, 226 (7th Cir. 1993). Central Contractors correctly points out that both the Funds' suit and the Grievance that led to this suit are based on the same factual allegations. [43] at 10. However, not all claims that have the same *origin* are necessarily deemed a single "claim" for purposes of res judicata. *Herrmann*, 999 F.2d at 226. Instead, the question is whether the claims themselves have material facts in common.

      While both cases can trace their roots to a single set of circumstances, the facts required to prove the claims do not overlap. In *Consolidation Coal Co. v. United Mine Workers of Am., Dist. 12, Local Union 1545*, 213 F.3d 404 (7th Cir. 2000), the Seventh Circuit upheld two district court decisions that enforced inconsistent arbitration awards that arose out of the same original set of facts. The court held that the individual arbitrations, rather than the underlying events, were the relevant transactions or occurrences. *Id.* at 408. Likewise, the decision of the JGC, rather than the alleged subcontracting and alleged failure to hold pre-job conferences, constitutes the "transaction" giving rise to this suit. As previously discussed, this court may not review the merits of the JGC's decision. In order to prove that it is entitled to relief before this court, the Union must only prove that there is a valid joint grievance committee award under the CBA. On the other hand, the Funds' claims in federal court in *Local 705* rested solely on the merits of the underlying dispute. The Funds needed to prove that Central Contractors engaged in practices that violated the CBA with respect to subcontracting and pre-job conferences. The facts necessary to prove the Funds' case do not overlap with the facts necessary to prove the Union's case. Thus, the causes of action in the two cases are not identical for res judicata purposes.

      As to the third element, Central Contractors appears to have adequately alleged privity between the Funds and the Union by pointing to the fact that both the Funds and the Union sought the same amount of money, which would be awarded to the Funds in either case. Privity is a "functional inquiry in which the formalities of legal relationships provide clues but not solutions." *Tice v. Am. Airlines, Inc.*, 162 F.3d 966, 971 (7th Cir. 1998) (quoting *Chase Manhattan Bank, N.A. v. Celotex Corp.*, 56 F.3d 343 (2d Cir. 1995)). While the Union argues that the Union and the Funds have distinct interests, the facts alleged in the counterclaim appear to plausibly suggest that the interests of the Funds and the Union were sufficiently aligned in these cases. *Tice*, 162 F.3d at 972.

      Nonetheless, the court need not definitively decide whether Central Contractors has adequately alleged privity. Since the causes of action in this case and the Funds' case are not identical, Central Contractors has not plausibly alleged a res judicata defense.

13

### 3. Collateral Estoppel

Central Contractors also asserts the related defense of collateral estoppel (issue preclusion). A party is collaterally estopped from relitigating an issue in a subsequent action in the following circumstances: "(1) the issue sought to be precluded is the same as an issue in the prior litigation; (2) the issue must have been actually litigated in the prior litigation; (3) the determination of the issue must have been essential to the final judgment; and (4) the party against whom estoppel is invoked must have been fully represented in the prior action." *Adams*, 742 F.3d at 736.

The first three elements of collateral estoppel depend on there being an issue in common between the two suits. Since Central Contractors does not clearly allege which issue it seeks to preclude, this affirmative defense is inadequate under the requirements of Rule 8. *See Ocean Atl. Woodland Corp. v. DRH Cambridge Homes, Inc.*, 2003 WL 1720073, at *10 (N.D. Ill. 2003) (a collateral estoppel affirmative defense did not satisfy Rule 8 where it was "unclear which issues" the defendants sought to preclude). Further, there is no issue in this case that was actually litigated in the Funds' case, *Local 705*. In *Local 705*, the court addressed issues related to the merits of underlying dispute. As discussed above, the court may not address those issues here. *See Merryman*, 639 F.3d at 290.

As with res judicata, Central Contractors has not adequately pled facts that plausibly support a collateral estoppel defense. While motions to strike are disfavored when they serve to delay, they are proper when they "remove unnecessary clutter from the case." *Heller*, 883 F.2d at 1294. Since removing these defenses streamlines the issues, resolution is appropriate at this stage. Central Contractors' ninth, tenth, and eleventh affirmative defenses are stricken, with leave to amend.

### B. Remaining Affirmative Defenses

The Union also moves to strike Central Contractors' remaining affirmative defenses. First, it argues that affirmative defenses one and thirteen should be stricken because they are not proper affirmative defenses under Rule 8(c). Affirmative defense one asserts that the Union's Complaint fails to state a claim upon which relief can be granted. [40] at 10 ¶ 1. However, failure to state a claim is not a proper affirmative defense under Rule 8(c); it should instead be raised in a motion under Rule 12(b)(6). *See Sarkis' Cafe*, 55 F. Supp. 3d at 1041; *Illinois Wholesale Cash Register, Inc. v. PCG Trading, LLC*, No. 08-cv-00363, 2009 WL 1515290, at *2 (N.D. Ill. May 27, 2009); *Instituto Nacional De Comercializacion Agricola (Indeca) v. Cont'l Illinois Nat. Bank & Tr. Co.*, 576 F. Supp. 985, 991 (N.D. Ill. 1983).

14

Affirmative defense thirteen states that Central Contractors "will rely on all defenses lawfully available to it at the time of trial and reserves the right to amend its answer and affirmative defenses after the completion of discovery." [40] at 12 ¶ 13. This "catchall" defense is improper, since "affirmative defenses must be pled based on facts known at the time of the answer." *Levin v. Abramson*, No. 18-cv-01723, 2020 WL 2494649, at *14 (N.D. Ill. May 13, 2020) (citing *Struve v. Electrolux Home Prod., Inc.*, No. 17-cv-08158, 2019 WL 918503, at *6 (N.D. Ill. Feb. 25, 2019); *Wausau Ins. Co. v. Woods Equip. Co.*, No. 01-cv-08009, 2002 WL 398542, at *3 (N.D. Ill. 2002)). The court strikes affirmative defenses one and thirteen.

The Union argues that affirmative defenses two through eight should be stricken for a different reason: they are time-barred. Central Contractors' second, third, fourth, fifth, sixth, and seventh affirmative defenses repeat the allegations of Central Contractors' counterclaim challenging the JGC's process and the merits of the JGC's decision, and its eighth defense raises the issue of whether the JGC issued a final and binding decision. As discussed above, the pleadings do not establish whether the JGC issued a final and binding decision. As with the counterclaim, the court therefore rejects the Union's timeliness argument. However, the court has "considerable discretion" to strike affirmative defenses and may do so "on its own." *Delta Consulting Grp., Inc. v. R. Randle Const., Inc.*, 554 F.3d 1133, 1141 (7th Cir. 2009). Accordingly, the court strikes affirmative defenses two through seven for the same reason that the court dismisses the counterclaim: the defenses fail to state a plausible claim for relief under the CBA. *See Maui Jim*, 386 F. Supp. 3d at 955 (dismissing an affirmative defense that was "coterminous" with a claim the court had dismissed).

Central Contractors' eighth affirmative defense (lack of finality) does not have the same defect as affirmative defenses two through seven. As previously discussed, this may be a viable defense. But it is not a proper *affirmative* defense since Central Contractors does not bear the burden of proof on the issue; the lack of a final and binding decision would controvert the Union's proof. *See Winforge, Inc. v. Coachmen Indus., Inc.*, 691 F.3d 856, 872 (7th Cir. 2012); *Levin*, 2020 WL 2494649, at *14. The defense is also duplicative of Central Contractors' denial of allegations in the complaint. *See* [40] at 7 ¶ 13. Since the question of whether the JGC issued a final and binding decision is already at issue, Central Contractors' eighth affirmative defense is stricken as unnecessary. *See World Kitchen, LLC v. American Ceramic Society*, 2015 WL 3429380, at *2 (N.D. Ill. 2015) (barring affirmative defenses where the defendant has already placed the matters at issue by denying allegations in its answer). However, Central Contractors remains free to raise the issue in the future.

Finally, the court strikes the twelfth affirmative defense, which asserts that the Union lacks standing, because Central Contractors has not pled any facts in support. *See Heller*, 883 F.2d at 1295 (striking affirmative defenses that were "nothing but bare bones conclusory allegations"). Nor could Central Contractors

15

properly plead this defense, since the Union necessarily has standing to enforce a grievance committee award arising out of a CBA to which it is a party.

Since none of Central Contractors' affirmative defenses plausibly state viable defenses, the court grants the Union's motion to strike in full, with leave to amend. Central Contractors' affirmative defenses are stricken pursuant to Rule 12(f).

## CONCLUSION

The motion to dismiss the amended counterclaim and strike amended affirmative defenses [41] is granted. The parties are directed to file by October 30, 2020 a joint status report proposing a plan for next steps in the litigation.

Date: October 9, 2020 /s/ Martha M. Pacold

16